IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

STANLEY KELLEY,

    Petitioner,                  No. 2:05-CV-01713 ALA HC

    vs.

J.D. STOKES, Acting Warden,        <u>ORDER</u>

    Respondent.

_____/

    Pending before this court are Stanley Kelley's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) (doc. 1), Respondent's answer (doc.17), and Petitioner's Traverse (doc. 18). For the reasons stated below, Petitioner's application is denied.

**I**

    Petitioner was convicted of first degree murder in the Los Angeles Superior Court on January 25, 1978. He was sentenced to serve a term of life imprisonment with the possibility of parole. The direct appeal of his conviction was affirmed by the Court of Appeal of the State of California Second Appellate District, on October 15, 1979.

    On February 14, 2004, the California Board of Prison Terms found Petitioner suitable to be released on parole.

    Governor Arnold Schwarzenegger reversed the Board of Prison Terms' decision to parole the Petitioner.

The Governor's parole release review reads as follows:

> On February 22, 1976, Stanley Kelly and his two companions ended a two-day crime spree, involving multiple armed robberies, with the senseless murder of Jimmy Grisby.
>
> As Mr. Grisby and Alvin Tate left a nightclub the night of February 22, they were accosted. Mr. Tate was robbed at gunpoint. Mr. Grisby resisted the robbery attempt – and was shot in the chest by one of Mr. Kelley's companions. Mr. Grisby died within minutes.
>
> Mr. Kelley was arrested and ultimately convicted in 1977 of, among other things, first-degree murder. He has been in prison for 28 years now.
>
> Despite the guilty verdict establishing Mr. Kelley's culpability for Mr. Grisby's murder, Mr. Kelley to this day denies knowing that his companions left the nightclub to go across the street to accost the victims. Mr. Kelley does, however, admit that he and his companions went to the nightclub together that night – and he does not dispute being present when Mr. Grisby was shot.
>
> Mr. Kelley's criminal history began when he was just 13 years old. He was arrested as a juvenile upwards of 15 times, mostly for theft crimes. As an adult, he was convicted six times for theft-related crimes, including the series of armed robberies that were committed in the days before Mr. Grisby was murdered. Likewise, Mr. Kelley's prison conduct is far from stellar. He has been disciplined nine times for serious-rules violations such as fighting with inmates, threatening an officer, and disrespecting staff. His most recent disciplinary occurred in 1996 for possessing and using marijuana. Mr. Kelley has also been counseled 11 times for other, less serious prison misconduct. According to confidential information contained in the record, Mr. Kelley was selling large amounts of marijuana in 1997, had a gang affiliation, and may have led an assault that resulted in the stabbing of a fellow inmate in 1984. Although Mr. Kelley has no juvenile record of assaultive or violent behavior, his adult record illustrates an escalating pattern of criminal conduct and a violent man who has failed society's previous attempts to rehabilitate him. Based on this factor alone, I question whether Mr. Kelley could be released to society at this time without continuing to pose an unreasonable risk of danger.
>
> To Mr. Kelley's credit, however, he has made significant educational and vocational gains while in prison. In addition to earning his GED in 1988, Mr. Kelley has taken 14 college-level courses and become a skilled surgical technician. He has acquired skills in closed-caption translating, map-making, and computer programming. He has consistently received above-average to exceptional work reports, as well as laudatory reports for his work ethic and professionalism from institution staff. He has received

favorable psychological and counseling evaluations.  He has participated in self-help and therapy programs, including regularly attending and holding a leadership position with Narcotics Anonymous.  He has also held positions of leadership in the Jaycees and on Project Last Chance.  I applaud Mr. Kelley for his hard work and for enhancing his ability to function within the law upon release from prison.  He should be proud of his institutional accomplishments.

While Mr. Kelley has over the years established positive relationships with family and others outside of prison, he currently has a very limited support system.  Mr. Kelley acknowledge at the 2003 parole hearing that "The only contact I have . . . is with my brother . . . ."  Mr. Kelley's parole plans include a housing offer extended to him from his brother – but no present job prospects or plan.  I note that Mr. Kelley was offered a job previously in a security-system business, but that potential employer told the Board in 2003 that the offer was rescinded because it would be inappropriate to hire Mr. Kelley given the nature of the business.  Mr. Kelley has indeed obtained some marketable skills while in prison, but it is not realistic – nor fair to the community – to release him from prison without a legitimate way to support himself.  Mr. Kelley admitted at his 2003 hearing that, while he was employed on a temporary, part-time basis, he committed robberies to pay for "rent . . . food . . . whatever I thought was necessary at that time."  His lacking employment plans undermine a conclusion that he would not pose an unreasonable risk to public safety if released from prison.

Moreover, Mr. Kelley has tried for many years to distance himself from the commission of the murder, and he has attempted to minimize his responsibility on the basis that he did not pull the trigger.  According to his psychological evaluations, Mr. Kelley in 1991 did not express remorse for the victim, nor did he identify any significant underlying causes for his criminal behavior.  Likewise, before 1992, his psychological evaluations noted that he would "put on a good face to impress others" and found that his exploration of the commitment offense remained "somewhat superficial."  It was not until around 1992 that Mr. Kelley began to acknowledge he had a role in Mr. Grisby's murder and expressed some remorse for the victim and empathy for the victim's spouse.  Mr. Kelley has made progress.  But it took him almost 16 years, and his gains are relatively recent in comparison.  Notably, Mr. Kelley when talking at the 2003 hearing about "who [I've] harmed like that," stated that his mother was at the top of his list "because [he] hurt her more than anybody . . . ."  His brother was second on his list.  There was no mention of Mr. Grisby or any other victims at this time.

A representative of the Los Angeles County District Attorney appeared at Mr. Kelley's recent parole hearing and opposed his

3

1  parole. The representative's reasons, among others, were that Mr. Kelley has not taken responsibility for the murder and that he has inadequate parole plans. I agree.

After carefully considering each of the factors the Board is required to consider, I believe Mr. Kelley could continue to pose an unreasonable risk to the public's safety if released. Accordingly, I REVERSE the Board of Prison Terms' decision to parole Mr. Kelley.

Decision Date: 3/15/04

_____
ARNOLD SCHWARZENEGGER
Governor, State of California

Petitioner filed a petition for a writ of habeas corpus in the Superior Court for Los Angeles County challenging the Governor's reversal of the Board of Prison Term's decision to parole the Petitioner. The Superior Court's denial of the petition reads as follows:

> The Court has read and considered Petitioner's Writ of Habeas Corpus filed on April 26, 2004, as well as the return and traverse filed in response to the Court's order to show cause. Having independently reviewed the record, giving deference to the broad discretion of the Governor in parole matters, the Court concludes that the record contains "some evidence" to support the Governor's finding that Petitioner is unsuitable for parole. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 667; *see* Cal. Code Regs., tit. 15, §2281.)
>
> The determination whether an inmate is suitable for parole is an executive decision rather than a judicial determination. (*In re Morrall* (2002) 102 Cal.App.4th 280, 294.) The Governor's discretion in such matters is "great" and "almost unlimited." (*Id.* at 297.) It is not the function of the Court to reweigh the evidence because courts may not undertake an independent assessment of the merits of the parole decision. (*In re McClendon* (2003) 113 Cal.App.4th 315, 321.)
>
> Here the record contains "some evidence" to support the Governor's conclusion that Petitioner is unsuitable for parole because of his significant prior criminal history which included a record of violence. (Cal. Code Regs., tit. 15, §2281(c)(2).) Further, there is "some evidence" in the record to support the Governor's conclusion that Petitioner is unsuitable because he has engaged in serious misconduct while incarcerated. (Cal. Code Regs., tit 15, §2281(c)(6); Cal. Code Regs., tit. 15, §3315.)

1   There is no evidence to support the Governor's conclusion that Petitioner lacks suitable parole plans. The record reflects Petitioner has developed marketable skills since his incarceration. (Cal. Code. Regs., tit. 15, §2281(d)(8).) The Court also rejects the Governor's finding that Petitioner minimizes his role in the commitment offense and therefore has not shown sufficient signs of remorse. (Cal. Code Regs., tit. 15, §2281(d)(3).) The record reflects Petitioner accepts responsibility for the commitment offense. The author of the psychological evaluation completed in 2003 concluded Petitioner has "explored the commitment offense and has come to terms with the underlying causes with effective and intellectual insight, accompanied by behavioral change." (October 17, 2003 Parole Hearing Transcript, at 43.) Therefore, the record contradicts the Governor's conclusions.

The Court finds Petitioner's arguments that the Governor's authority to review the Board's decision violates the *ex post facto* clause of the United States Constitution and that the Governor has a "no-parole policy," are without merit. Both of those arguments have specifically been considered and rejected by the California Supreme Court.[1] (*Rosenkrantz*, supra, at 659-661, and 684.) The Court also finds the Governor's reversal properly applied the considerations set forth in Penal Code §3041. The record reflects the Governor considered Petitioner's positive institutional gains but found they did not outweigh the factors for unsuitability and that Petitioner would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. (Penal Code §3041(b).) Thus, until the Governor concludes Petitioner no longer poses an unreasonable risk of danger or to public safety, the proportionality requirements of Penal Code §3041(a) are not applicable.

Accordingly, the petition is denied.

Petitioner filed a petition for writ of habeas corpus in the Court of Appeal of the State of California Second Appellate District. It was denied summarily on April 13, 2005.

Petitioner filed a petition for review in the Supreme Court on May 10, 2005. It was summarily denied on July 20, 2005.

The record shows that Petition exhausted his state judicial remedies.

**II**

---

[1] *Rosenkrantz* specifically addressed the policies of former Governor Gray Davis. However, Petitioner offers no credible evidence that current Governor Arnold Schwarzenegger, employs a "no-parole policy."

**A**

Petitioner filed his application for a writ of habeas corpus before this Court pursuant to 28 U.S.C. § 2254(a) on August 24, 2005.  It was timely filed.

Petitioner contends that the Governor's decision was time barred and therefore void because it was filed more than thirty days after the Board of Prison Terms concluded that he was suitable for release on parole.

Petitioner has failed to demonstrate that the Governor failed to review the materials provided by the Board of Prison Terms during the thirty days following its grant of parole to the Petitioner.  Section 3045.2 of the California Penal Code provides that

> (a) During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V. of the Constitution, shall review materials provided by the parole authority.

The record shows that the Governor sent a written statement of his decision to reverse the Board of Prison Terms' February 14, 2004 decision on March 15, 2004, thirty days after the Board of Prison Terms determination that Petitioner should be released on parole

**B**

Petitioner also asserts that he was denied procedural due process because he was not allowed to be present or heard when the Governor rejected the Board of Prison Terms decision to release him on parole.  The only authority he cites for this proposition is Cal. Pen. Code § 3041.5(a)(2).  That section applies solely to hearings held by the Board of Prison Terms "for the purposes of reviewing a prisoner's parole suitability, or the sitting, postponing, or rescinding of parole dates . . . ."  Cal. Pen. Code § 3041.5(a).

Section 3041.2 sets forth the total duties of the Governor in reviewing a parole decision by the Board of Prison Terms.  It reads as follows:

>(a) During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V. of the Constitution, shall review materials provided by the parole authority.
>
>If the Governor decides to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 of Article V of the Constitution, he or she shall send a written statement to the inmate specifying the reasons for his or her decision.

Cal. Pen. Code § 3041.2 (2007).

There is no requirement in section 3041.2 that the Governor must review the Board of Prison Term's decision in the presence of a prisoner, or that he or she has the right to present evidence, and speak on his or her own behalf.  Petitioner has failed to demonstrate that his procedural due process rights were violated in this respect.

**C**

In his traverse, Petitioner contends that the Superior Court applied the wrong standard of review in determining whether the Governor deprived him of a liberty interest in violation of the Fourteenth Amendment.  He asserts that the Superior Court erred in applying the some evidence standard rather than reviewing the Governor's decision to determine if it is supported by a preponderance of the evidence.

In his answer to the Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a), Respondent argued that California prisoners do not have a federally protected liberty interest in parole.  He maintains that the Petitioner failed to demonstrate that the Superior Court's decision was contrary to or an unreasonable application of federal law as established by the United States Supreme Court.

Congress has declared that an application for a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment shall not be granted with respect to any

7

claim that was adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

After Respondent filed his answer to Petitioner's application, and the filing of his traverse, the Ninth Circuit held in *Hayward v. Marshall*, 512 F.3d 536 (9th Cir. 2008), that a Governor's decision to reverse a parole grant must be assessed "under the same procedural due process principles [courts] use to review challenges to the Board's denial of parole." *Id.* at 542.

In a supplemental brief filed on May 22, 2008, Respondent argues that this court is not bound by the Ninth Circuit's decision in *Hayward* that a finding that a prisoner is unsuitable for parole is violative of due process unless it is supported by some evidence that "a prisoner's release will unreasonably endanger public safety." *Id.* at 543. Respondent maintains that the Court's holding in *Hayward* is not based on a clearly established law as determined by the Supreme Court of the United States. Respondent's argument ignores the principle that "[d]istrict courts are, of course, bound by the law of their own Circuit and 'are not to resolve splits between circuits no matter ow egregiously in error they may feel their own circuit to be.'" *Zuniga v. United Can Co.*, 812 F.2d 443, 450 (9th Cir. 1987) (citation omitted).

In *Hayward*, the Court held that "California prisoners have a liberty interest in parole" and "a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by some evidence in the record, or is otherwise arbitrary." *Hayward*, 512 F.3d at 542 (internal quotation marks and citations omitted). The test is not whether "'some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's

release unreasonably endangers public safety.'" *Id.* at 543 (9th Cir. Cal. 2008) (citation omitted).

Thus, under compulsion of the Ninth Circuit's decision in *Hayward*, this Court must reject Petitioner's contention that the preponderance of evidence standard is applicable, and instead apply the "some evidence" standard in determining whether Petitioner's due process liberty interest was violated by the Governor in his determination that Petitioner's release would endanger public safety.

### III

#### A

In this matter, the Governor reversed the Board of Prison Term's parole release decision based on several findings:

One:  Petitioner's criminal history that began when he was thirteen years old. This included upwards of fifteen assaults for theft crimes as a juvenile, and six times for theft-related crimes and a series of armed robberies committed days before the "senseless murder" of the victim which resulted in Petitioner's conviction of first degree murder.

Two:  Petitioner's prison conduct which has resulted in his being disciplined nine times for serious rule violations including fighting with inmates and threatening an officer. Petitioner has also been counseled eleven times for less serious violations.  His record also contains information that he had a gang affiliation.

Three:  While Petitioner had no juvenile record of assaultive or violent behavior, his adult record "illustrates an escalating pattern of criminal conduct which failed society's previous attempts to rehabilitate him."

Four:  Petitioner has failed to demonstrate any job prospects or a "legitimate way to support himself."  Petitioner stated in his 2003 parole hearing that he committed robberies in the past to pay for rent and food while employed on a temporary part-time basis.

Five:  Petitioner's release on parole was opposed by a representative of the Los Angeles County District Attorney's Office because Petitioner had failed to take responsibility for

the murder and has inadequate parole plans.

The Governor also noted that Petitioner had made "significant educational and vocational games while in prison" and has received "favorable psychological and counseling evaluations."

In his supplemental brief, filed on April 24, 2008, Petitioner contends that the Governor's sole basis for reversing the Board of Prison Terms' decision to release Petitioner on parole was the "underlying offense." He argues that a prior offense is "no longer some evidence that will rationally support a finding that public safety requires that Kelly (sic) be found unsuitable for parole." Petitioner's contention accurately summarizes the Ninth Circuit's holding in *Hayward*. It does not, however, properly reflect or address the Governor's findings.

**B**

"[A] continued reliance on an unchanging factor such as the circumstances of the commitment offense, pre-conviction criminal history, or other past conduct, might in some cases result in a due process violation at some point." *Hayward*, 512 F.3d at 545. "'The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison.'" *Id.* (citation omitted). In *Hayward*, the Governor's decision violated Hayward's due process rights because it relied on "the unchanging factor of the gravity of Hayward's commitment offense [which] had no predictive value regarding his suitability for parole." *Id.* at 546.

Unlike the Governor's sole basis for reversing the Board of Prison Term's decision in *Hayward*, in this matter, the Governor here relied on evidence relating to Petitioner's post-commitment conduct, and evidence with predictive value regarding Petitioner's suitability for parole.

The Governor relied on evidence that while in prison, Petitioner has been disciplined for fighting with inmates and threatening an officer. This is evidence that his release will

unreasonably endanger public safety.

Also, the Governor found that Petitioner's " lacking employment plans undermine a conclusion that he would not poses an unreasonable risk to public safety if release from prison" based upon Petitioner's admission that he engaged in armed robbery in the past when he needed funds to pay his rent and feed himself. Although this conclusion relies on Petitioner's pre-conviction criminal history, the reliance is justified. In the past, when unemployed, Petitioner robbed in order to sustain himself. At his 2003 parole hearing, Petitioner had no job prospects. This evidence is some evidence that his release will unreasonably endanger public safety because it indicates that he will rob again. *See Hayward*, 512 F.3d at 545(citation omitted) (holding that reliance on a static pre-commitment factor is permissible so long as "'evidence in the record rationally indicate[s] that the offender will present an unreasonable public safety risk if released from prison'").

### IV

The Superior Court found that "[t]here is no evidence to support the Governor's conclusion that Petitioner lacks suitable parole plans . . . . [t]he record reflects that Petitioner has developed marketable skills since his incarceration." However, the Superior Court also concluded that "there is 'some evidence' in the record to support the Governor's conclusion that Petitioner is unsuitable because he has engaged in serious misconduct while incarcerated." Therefore, this Court concludes that the Superior Court did not unreasonably err in applying the some evidence standard in holding that "[t]he record reflects that the Governor considered Petitioner's positive institutional gains but found he did not outweigh the factors for unsuitability and that Petitioner would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."

xxxxx

It is Therefore Hereby Ordered that Petitioner's Application for Habeas Corpus Relief is

1  DENIED.

3  DATED: May 6, 2008

/s/ Arthur L. Alarcón<br>
UNITED STATES CIRCUIT JUDGE<br>
Sitting by Designation